Alfred F. GOSHORN et al., Plaintiffs,

v.

BAR ASSOCIATION OF the DISTRICT OF COLUMBIA, a corporation, Defendant.

Civ. A. No. 2393-56.

United States District Court District of Columbia.

June 7, 1957.

---

1. Interrogatory number 358 of Group I is dated 1952. This may be a typographical error. If not, it should be answered.

Wesley E. McDonald, Lawrence J. Simmons, Washington, D. C., for plaintiffs.

Alfred F. Goshorn, Washington, D. C., in pro. per.

Preston C. King, Jr., Howard Westwood, Edward Bennett Williams, Washington, D. C., for defendant.

WILKIN, District Judge.

The Complaint seeks a declaratory judgment invalidating the action of the defendant Association at its meeting of May 8, 1956, with reference to the proposed amendment to the By-Laws of the Association by deleting the word "white" from Article I which fixed and classified the eligibility of members, and the Complaint prayed for an injunction restraining officers of the Association from any action based on, or in furtherance of, the procedure at such meeting.

The Answer alleges that the Complaint fails to state a claim against the defendant upon which relief can be granted:

alleges that the action taken by the Association was proper and in full conformity with its By-Laws;

alleges that the plaintiffs have waived any objections by their failure to take proper and timely action;

alleges that the plaintiffs have not suffered any injury to themselves entitling them to the relief asked;

alleges that this court lacks power to interfere in the affairs of the private professional organization in the · manner sought by the Complaint;

alleges that this court cannot grant relief to the plaintiffs without denying rights protected by the Fifth Amendment to the Constitution and the public policy of the United States.

Two judges of this court, acting separately, denied motions for summary judgment. The case then came on for trial on the merits to determine the disputed issues of fact and questions of law. The principal issue was the validity or invalidity of the declaration of the president, based on a voice vote, that the resolution for the amendment had carried by a two-thirds vote of active members present, and that the amendment was, therefore, adopted. The determination of that issue depends on the con-

ditions and circumstances before, at the time of, and after, the voice vote. The disagreements and differences in testimony related to details of minor or secondary importance. As to the most essential facts and circumstances, there was general agreement.

There was no dispute as to the following provisions of the By-Laws:

### "Article I

### "Membership

"Section I. Classes. The following classes shall constitute the membership of the Association.

"A. Active Members. All members of the Association at the date of the adoption of these By-Laws shall be classified as active members.

"White members of the Bar of the District Court of the United States for the District of Columbia, in good standing, in active practice in the District of Columbia, shall be eligible to active membership in the Association, as hereinafter provided.

"B. Associate Members. White residents and non-residents of the District of Columbia who are members of the Bar, in good standing, of the highest Court of any State or Territory, and who are not engaged in or attempting to engage in active practice in the District of Columbia, may be admitted to associate membership, as hereinafter provided.

"White members of the Bar of the District Court of the United States for the District of Columbia, in good standing, not in active practice, may be admitted to associate membership, as hereinafter provided."

### "Article VI

### "Meetings

"Section 5. Quorum. At any meeting of the Association, the presence of one hundred active members shall be necessary to constitute a quorum.

"Section 8. Parliamentary Rules. The parliamentary rules of practice contained in Robert's Rules of Order, as revised, shall govern the Association in all cases to which they are applicable and in which they are not inconsistent with the By-Laws or the special rules of order of this Association."

And there was no dispute as to the following provisions of Robert's Rules of Order:

"The vote shall always be taken first by the voice (viva voce) or by show of hands (the latter method being often used in small assemblies), except in the case of motions requiring a two-thirds vote when a rising vote should be taken at first." Section IX, p. 42, Robert's Rules of Order.

"A division of the assembly may be called for, without obtaining the floor, at any time after the question has been put, even after the vote has been announced, and another has the floor, provided the vote was taken viva voce, or by show of hands, and is called for before another motion has been made. This call, or motion, is made by saying, 'I call for a division', or 'I doubt the vote', or simply by calling out 'Division'. It does not require a second, and cannot be debated, or amended, or have any subsidiary motion applied to it. As soon as a division is called for, the chair proceeds again to take the vote, this time by having the affirmative rise, and then when they are seated, having the negative rise. * * *" Section 25, p. 95, Robert's Rules of Order.

It was admitted that there was no count of active and associate members.

It was agreed that only a voice vote was taken.

The weight of evidence indicated that there was a substantial volume of sound as to both "yeas" and "nayes". One or two witnesses indicated that the sound volume of the two votes was about equal, and most of the witnesses testified that it was impossible for anyone to determine

positively whether those voting in the affirmative represented two-thirds of the qualified members.

It was agreed that the meeting had an unusually large attendance, estimated to be about 520 persons. The meeting was held in the Williamsburg Room of the Mayflower Hotel.

There was a dispute and disparity of testimony as to whether or not a division had been called for specifically.

The minutes of the meeting recite, at p. 379 of defendant's Exhibit No. 2:

"Mr. Alfred F. Goshorn rose to a point of order with reference to those persons in attendance and stated that there was no way to determine whether they were entitled to vote or not. He thereupon moved that the motion be tabled. The Chair ruled the motion out of order stating that when the time came those not eligible to vote could be requested not to do so and that any member present could request that there be a division so that ineligible persons could step to one side of the room and only those eligible to vote would do so."

The testimony of the president and secretary supported the statement of the minutes. Other members of the Association who testified stated that the president said, with a gesture of the hand, that when the vote was taken, he would ask all Associate members and guests to move to one side of the room. It was conceded, however, that no such separation occurred. After some preliminary points of order and motions, relating to presence of persons ineligible to vote and method of voting, were disposed of, the president declared that the pending action was on the motion to adopt the amendment. One member spoke in favor of the amendment and no one spoke in opposition. The minutes recite:

"Upon a call for the question the Chair asked for the 'ayes' and then the 'nays' on Mr. Moore's motion. The vote having been taken by voice the Chair ruled that the motion had been passed and that the 'ayes' were more than the required two-thirds vote of the active members in good standing present."

The minutes continue:

"Mr. Paul Lee Sweeny rose to a point of order and appealed from the ruling of the Chair stating that the Chair could not rule on whether the affirmative vote on Mr. Moore's motion had been the required two-thirds. The Chair put the appeal to a voice vote, after which the Chair ruled that the appeal was denied and the original ruling upheld."

The president and the secretary testified that the statement in the minutes was correct. Mr. Sweeny, however, testified that he arose and objected to the method of taking the vote and that, when the Chair ruled him out of order, he then appealed from the ruling of the Chair. There was other diversity of testimony regarding the minutes on this point, some supporting the statement in the minutes and some supporting Mr. Sweeny's statement.

All the testimony, however, agreed that, after the president announced the passage of the motion, there was great confusion. The president himself referred to it as "cheering"; others referred to it as "applause" and "noise". Witnesses for the plaintiffs referred to the occurrence as "bedlam" and "hubbub". The president and the secretary and some other witnesses testified that they did not hear anyone calling for a division, in that exact word. Many witnesses testified, however, that there were members standing and calling for recognition. A number of the witnesses said that they heard calls for division, and some witnesses said that they themselves had so called. The only member recognized by the Chair, however, was Mr. Sweeny, and when his objection and appeal were disposed of, the president called for consideration of other business.

Thereafter, certain members of the Association presented petitions and protests, dated May 16 and May 14, 1956, to the Board of Directors of the defendant

Association. (Plaintiffs' Exhibits Nos. 3A, 3B, 3C.) The Board declined to take any action thereon, and no change in the minutes of the May 8 meeting was made by the Association at its next meeting, as shown by Defendant's Exhibit No. 3.

Another fact emphasized by the plaintiffs was admitted by the defendant—the same proposal for amendment had been submitted twice, or possibly three times, by referendum, and had failed of adoption because the votes in favor did not meet the two-thirds requirement.

■ This Court is constrained by the admissions and the weight of the testimony to find that the objections, motions and protests at the meeting of May 8, 1956, were sufficient to apprise the Chairman that the method of taking the vote was objected to, and that a division and visible count of members for and members against the motion was desired. The Court concludes that it was a violation of the By-Laws and of Robert's Rules of Order for the presiding officer to fail to call for a rising vote. The Court is impelled to such finding and conclusion especially by the fact that highly-respected members of the Association testified in support of the plaintiffs, in spite of the fact that they had favored, and voted for, the proposed amendment. One of these witnesses said that, regardless of the language used, it was clearly apparent that a number of persons were demanding a division in the sense that they wanted the members who voted for or against the proposed amendment to be counted for the purpose of determining with certainty whether or not the proposed amendment had been adopted by at least a two-thirds vote of the members entitled to vote, and that such demands were not honored. In an affidavit filed in this case, that witness had said:

"I insist upon saying at this time that the Board of Directors of the Bar Association of the District of Columbia will represent me in my status as a member far better if they will put a speedy end to this sorry squabble which is injuring the prestige of the Bar Association and of the legal profession, and will resubmit the controversial amendment to the members of the association and poll a vote with respect thereto in such manner that there will be no doubt as to the result and the legality of the proceeding. I feel that the value of my membership in the association will be further impaired by the prolongation of a situation which has caused many of my respected associates to believe that their rights have been violated and which at the same time makes it embarrassing for the self-respecting Negro members of the bar to apply for membership in the association."

This Court finds and holds that the allegations of the Answer, in view of all the circumstances and the law, are not sufficient to prevent the relief prayed for in the Complaint.

It was argued, in support of the defense, that the plaintiffs would have to prove fraud and bad faith on the part of the president and secretary in order to sustain their Complaint. Counsel for the plaintiffs, however, very graciously stated that the plaintiffs neither alleged nor implied any bad faith or willful misconduct. He spoke of the officers of the Association in high praise and conceded that the Chairman was trying to effectuate the sense of the meeting. He placed his prayer for relief squarely on the illegality of what was done, alleging firmly that it was contrary to both the letter and spirit of the By-Laws of the Association and of Robert's Rules of Order.

With such statements of counsel for plaintiffs, this Court concurs. It imputes no improper motives in the officers, but finds illegality in the action of the meeting. Its judgment is not against the purpose of the amendment, but against the attempted method of adoption. The tenor of all the testimony creates the impression that the meeting of May 8, 1956, was surcharged with feeling and emotion incompatible with calm deliberation and judicious action. Leaders of Reform movements seem prone to become over-

zealous. They then think that, because their objective is commendable, any method of attaining it is justifiable. In other words, they assume that the end justifies the means. But that theory can never be sustained in a court of law. If it were approved, the law would lose its virtue as a social and political bond. We would cease to have a government of and by law. We would then be ruled by the capricious, arbitrary and tyrannous conduct of majorities and those in office.

Discipline is an inherent requirement of human nature—in the individual and in the body politic. History reveals that when discipline is not self-imposed, it must be super-imposed. The life of democracy depends on its observance of the law. In determining its judgment, a court of law must consider its effect, not only on the instant case, but also on all similar cases. The affirmance of a voice vote in the circumstances of this case would reduce to a nullity the provisions for two-thirds votes in the By-Laws of all associations and corporations.

This Court is not unmindful that the provision for a two-thirds vote in by-laws or constitution has been severely criticized as impractical, more harmful than beneficial, and a means by which an arbitrary minority may thwart the will of the majority. Such criticism has been most prevalent against the provision in our Federal Constitution which requires a two-thirds vote for Senate approval of treaties. Const. art. 2, § 2, cl. 2. It has been referred to by respected authority as "an outmoded flaw in our Constitution", "a fatal defect". Edward S. Corwin, in "The Constitution and World Organization", has said, "The two-thirds rule was an anomaly before it was ever put into operation, and everything that has happened since 1789, both within the constitutional system and outside of it, has contributed to aggravate its abnormity. For further discussion and authorities, see "The United States and The World Court", by Denna Frank Fleming, Chapter X.

This consideration was not advanced in this case. It is mentioned here merely to say that if those who are irked by the two-thirds rule will not move to repeal it, they should not try to evade it. As long as it is the law, it should be observed and obeyed, especially by lawyers.

The allegations of the Answer that this court lacks jurisdiction and will not interfere in the affairs of a private corporation were disposed of by the ruling on the defendant's motion for summary judgment, but it seems well for the Court to state here that this defendant Association is an organization of members of the Bar of this court. From earliest times, the courts of England and of this country have assumed, and exercised, a supervisory jurisdiction over organizations and assemblies of persons licensed by the Court to practice law. It was judicially determined by Lord Mansfield that, while the courts had no jurisdiction over the Inns of Court "according to the general law of the land", yet, "in every instance their conduct is subject to the control of the Judges as visitors."

This Court, and the Court of Appeals of this judicial district, have taken jurisdiction of other cases questioning the action of the Bar Association. United States ex rel. Robinson v. Bar Association of District of Columbia, 91 U.S. App.D.C. 5, 197 F.2d 408; United States ex rel. Noel v. Carmody, 80 U.S.App.D.C. 58, 148 F.2d 684.

■ While it may be conceded that the plaintiffs have sustained no pecuniary loss or direct property damage from the action complained of, yet it is the view of this Court that they have acquired, by joining and paying dues to the defendant Association, an interest in the Association and its property, and privileges which entitle them to assert that the character or membership of the Association shall not be changed except in accordance with the By-Laws of the Association (said to be the oldest in America).

■ It is the opinion of this Court that the assertion of such rights and interests does not violate rights protected by the Fifth Amendment of the Constitution or the public policy of the United

States. The Legal Register for the District of Columbia lists a number of bar associations besides the defendant, which have limited or restricted membership. In addition to the defendant Bar Association, there is the Washington Bar Association, the Women's Bar Association, the Federal Bar Association. There is also a Patent Bar Association and a Barristers Club or Association. The legality and propriety of such associations have not been questioned, and members who have joined such associations have a right to insist that they continue to represent the special interests for which they were organized until their purpose and objective are changed in accordance with the basic law of the organization. Ross v. Evert, 275 Wis. 523, 82 N.W.2d 315.

People of any race, religion, or political faith may assemble and associate for the advancement of their interests. No sound public policy would destroy the interesting diversity of life. If the aim and end of democracy should be to reduce all men to the same shape and shade and common opinion, then it could and should not survive. It would counter one of the fundamental principles of evolution.

It is apparent to any person of fair mind that, if the defendant Association wishes to represent and to speak for all the lawyers of the District, then in all fairness it ought to make all lawyers eligible for membership. If it does not do so, then members of the bar who champion the proposed amendment ought to unite with other members of like mind and organize an all-inclusive bar association for the District which would be authorized to speak and act for all persons admitted to practice before the United States District Court.

The defendant Association, for a long time, has restricted its membership, and some of its members emphasize that object and purpose of the Association which is "to increase the mutual improvement and social intercourse of its members". If they feel that the social purposes of a limited membership are of more importance than being the agency of the entire bar of the District, their wishes and desires should not be overridden or denied except by action of the Association taken in accordance with the By-Laws.

Judgment for plaintiffs. This opinion may serve as findings of fact and conclusions of law, and counsel may prepare and submit a final order.