COMMERCIAL STATE BANK OF ROSE-VILLE and State Bank of Fraser, Plaintiffs,

v.

Ray M. GIDNEY, Comptroller of the Currency, Defendant.

No. 1626–59.

United States District Court District of Columbia.

July 1, 1959.

N. Barr Miller, Washington, D. C. (J. Marvin Haynes; Joseph H. Sheppard, Washington, D. C., Clark C. Seely, Detroit, Mich., J. Russell LeBarge, Roseville, Mich., Kenneth J. McCallum, East Detroit, Mich., of counsel), for plaintiffs.

Robert J. Asman, Asst. U. S. Atty., Washington, D. C., for defendant.

YOUNGDAHL, District Judge.

Two state banks have moved for a preliminary injunction to restrain the Comptroller of the Currency from issuing a certificate authorizing a national bank to open a branch office in Clinton Township, Michigan.

Plaintiffs are two Michigan banks; one has its principal place of business in Roseville, Michigan, and the other in Fraser, Michigan. Immediately adjacent to Roseville, and one mile from the eastern boundary of Fraser is the unincorporated township of Clinton. The Manufacturers National Bank of Detroit (hereinafter referred to as National) has applied to the Comptroller of the Currency for a certificate authorizing the establishment of a branch bank in this township at a place within two and one-half miles of the principal office of each

of plaintiff banks. Plaintiffs filed suit for an injunction and a declaratory judgment prohibiting the issuance of the defendant's certificate of authorization to National.

The chronology is as follows: On March 9, 1959, National submitted its application to the Comptroller. On May 26, the Comptroller's District Examiner notified the plaintiffs of the pending application and asked for their views "regarding the establishment of branch banking facilities at the location described". The letter then stated: "We shall appreciate your early reply as a decision on the subject proposal is imminent." The next day, May 27, objections to the establishment of National's branch were filed on behalf of the Fraser and Roseville state banks; a hearing was granted and scheduled for June 17. Shortly before June 11, plaintiffs asked the defendant whether the "usual practice" of having a time delay between approval of the application and issuance of the certificate, would be followed in this case. Defendant advised plaintiffs that the certificate might be issued contemporaneously with the approval; that the certificate of authorization might be used as notification of approval. On June 11, plaintiffs requested defendant to advise them of any contemplated issuance of a certificate *prior* to its issuance so that plaintiffs could, if they desired, take legal action to protect their rights. Defendant's reply, received by counsel for plaintiffs on June 15, stated:

> "It is not the policy of this office to make advance announcements of actions which it proposes to take. Consequently, we cannot accede to the request of your clients that they be notified in advance of the action which we take on this application."

1. On June 26, at the conclusion of the hearing on plaintiffs' motion for a preliminary injunction, this restraining order was extended for ten days, unless sooner dissolved, to enable the Court to prepare its findings of fact, conclusions of law, and order. Cf. United States v. United Mine Workers, 1947, 330 U.S. 258, 293, 67 S.Ct. 677, 695, 91 L.Ed. 884:

Because plaintiffs believed they would be powerless to question the validity of the branch bank once the certificate issued, plaintiffs, on June 16, brought suit in this court and secured from Judge Curran, ex parte, an order restraining the defendant and his agents until June 26 "from issuing to * * * National * * * his Certificate approving and authorizing * * * a branch of said Bank * * * in * * * Clinton * * *." 1

The next day, June 17, the scheduled hearing was held in the Comptroller's office at which time the Comptroller informed the plaintiffs that so long as the order restraining him from issuing a certificate to National was outstanding, he would make no determination.

In Perry v. Perry, 1951, 88 U.S. App.D.C. 337, 190 F.2d 601, 602, Judge Bazelon stated:

> "When a motion for preliminary injunction is presented to a court in advance of hearing on the merits, it is called upon to exercise its discretion 'upon the basis of a series of estimates: the relative importance of the rights asserted and the acts sought to be enjoined, the irreparable nature of the injury allegedly flowing from denial of preliminary relief, the probability of the ultimate success or failure of the suit, the balancing of damage and convenience generally. A mere listing of the guiding considerations demonstrates their intangible nature, especially when no attempt is made at this stage to decide finally the questions raised.' " 2

It is seen, then, that the Court must explore the merits of plaintiffs' contentions so as to be able to exercise its discretion.

> "In the case before us, the District Court had the power to preserve existing conditions while it was determining its own authority to grant injunctive relief."

2. And see Doeskin Products v. United Paper Co., 7 Cir., 1952, 195 F.2d 356, 358–359; 6 Moore's Federal Practice par. 65.04[2].

■ Federally chartered banks exist solely by virtue of federal law; the National Banking Act constitutes "by itself a complete system for the establishment and government of national banks."[3] "But a national bank is subject to state law unless that law interferes with the purposes of its creation, or destroys its efficiency, or is in conflict with some paramount federal law."[4] Branch banking (banking operations at other than the principal office) by national banks is regulated by state law because Congress has so provided. That is, Congress has adopted state law on the establishment of branches by state banks as the measuring stick for the establishment of branches by national banks. 12 U.S.C.A. § 36(c).[5]

■ Consequently, it is necessary for the Court to turn to Michigan law to determine the legality of the establishment of a branch bank at the location here in question. Section 487.34 of the Michigan Financial Institutions Act provides, *inter alia,* that

"Any bank * * * may * * * establish and operate a branch or branches within a village or city other than that in which it was originally chartered: Provided, That the village or city in which it is proposed to establish and operate a

branch is located in the same county in which the parent bank has its principal office or, if not in said county, then within 25 miles of said parent bank * * * Provided further, That no such branch shall be established in a city or village in which a state or national bank or branch thereof is then in operation * * *. Any bank may * * * establish and operate a branch or branches within the limits of the city or village in which said bank is located * * *."[6]

In banking parlance, there are "outside branches" and "inside branches". An "outside branch" is a branch office in a village or city other than the one in which the parent bank is located. An "inside branch" is a branch in the same village or city as the parent. This statute permits a parent bank to have inside branches in the same village or city that other inside branches are located; but it prohibits a parent bank from having an outside branch in a village or city that already possesses a bank (be it parent or branch). See Michigan National Bank, Lansing, Michigan v. Gidney, 1956, 99 U.S.App.D.C. 134, 237 F.2d 762, certiorari denied 1956, 352 U.S. 847, 77 S.Ct. 55, 1 L.Ed.2d 54.

National's main office is located in Detroit (Wayne County) and they are

3. Cook County Nat. Bank v. United States, 1882, 107 U.S. 445, 448, 2 S.Ct. 561, 564, 27 L.Ed. 537. The present system of national banks was created by the National Banking Act of 1864, Rev.Stat. §§ 5133–5156 (1875). Present statutory provisions governing national banks are found in 12 U.S.C.A. §§ 21–213; Federal Reserve regulations also apply since national banks must be members of the Federal Reserve System. 38 Stat. 252 (1913), as amended, 12 U.S.C.A. § 501a.

4. Lewis v. Fidelity & Deposit Co., 1934, 292 U.S. 559, 566, 54 S.Ct. 848, 851, 78 L.Ed. 1425.

5. The pertinent provisions of § 36(c) read: "A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establish-

ment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. * * *"

And § 36 is the exclusive authority for the establishment of a branch of a national bank; reliance can not be placed upon incidental powers flowing from 12 U.S.C.A. § 24. First Nat. Bank in St. Louis v. State of Missouri, 1924, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486.

6. 3 Mich.Comp.Laws 1948, § 487.34.

seeking to establish a branch in Clinton Township (Macomb County) at a point which is within twenty-five miles of their main office in Detroit. Plaintiffs argue that this outside branch can not legally be authorized since: (1) Clinton is not a "village or city" within the meaning of § 487.34, and (2) even if Clinton is considered a "village or city", an outside branch is already in operation in Clinton.

### Is Clinton a "village or city" within the meaning of § 487.34?

■ Plaintiffs contend that Clinton is not a "village or city" because (a) it is unincorporated, and (b) the nature of the community does not satisfy the test laid down in Wyandotte Savings Bank v. Eveland, 1956, 347 Mich. 33, 78 N.W.2d 612.

Wyandotte squarely holds that § 487.34 does not prohibit branch banks in an unincorporated village. While a branch of a state bank was involved there, § 36 (c) would appear to compel a federal court to adopt Michigan law on the point and hold that a national bank is not prohibited from having a branch in an unincorporated village in Michigan. This seems reasonable in light of the apparent purpose of Congress to have *exactly* the same standards—state law—apply to the establishment of national bank branches as apply to the establishment of state bank branches.[7] Thus, plaintiffs' contention (a) seems without merit. But (b) is not so easily disposed.

In Wyandotte, S, a state bank, had secured approval from the Michigan Commissioner of Banking for the location of a branch office in the unincorporated township of Ecorse. W, a state bank,

and N, a national bank, brought a bill in chancery to have the approval set aside and to enjoin the establishment of S's branch. W and N argued that the language of § 487.34—"village or city"— limited branch banking to incorporated municipalities. In rejecting the argument and holding that § 487.34 did not forbid branch banks in unincorporated villages, the Court carefully presented the facts peculiar to Ecorse in order to show that Ecorse was indeed a village within the common understanding of the word. The Court stressed that the community was "built up solid", had a population in excess of 18,000, "forty stores, drive-in restaurant, professional and dental offices, Federal Department store, parking for five thousand automobiles", and was a "thriving, growing community" with "every type of business except the bank". 78 N.W.2d at page 615.

Clinton township apparently is of a different character. It is an unincorporated area of approximately seven square miles in Macomb County, Michigan. It has at least one elementary school, two churches and a population of 1,300. A considerable part of the area is utilized for cemeteries and it has been described as lacking any "solid mercantile area" or industry, although it is indicated that there is a lumber yard in the area. The roads are gravel and "bordered by open ditches"; "there are no sewers" in at least part of the area; there are three abandoned gravel pits presently used for dumping refuse. In general, it can fairly be said that the area has spotty commercial and residential development.

■ Whether Clinton is more analogous to a township such as Ecorse than it is to an open cornfield[8] is not for this

---

7. Millard v. National Bank of Detroit, 1953, 338 Mich. 610, 61 N.W.2d 804, is not to the contrary. The Court there went off on a jurisdictional point: the state attorney general lacks authority to bring quo warranto proceedings in a state court to challenge a national bank's right to establish a branch in contravention of state law.

8. "We are unimpressed with the argument

that mention, in section 34 of the act * * * of 'the limits of the city or village' interposes an obstacle to the establishment of the branch here involved. When and if the commissioner of banking authorizes the establishment of a branch in an open cornfield, we may have to meet the question (among others) of whether or not such branch is within the village 'limits,' but here it is proposed to establish the branch in the

Court to decide. It is enough to say that in this Court's opinion the plaintiffs might very well succeed in distinguishing Wyandotte; the plaintiffs quite conceivably will be able to prove that Clinton is not a "village" even if Ecorse is. Wyandotte therefore can not be taken to preclude relief to the plaintiffs and the sought-after preliminary injunction can not be denied on its authority.

### Has National been pre-empted?

■ Plaintiffs further contend that even if Clinton is considered a "village", an outside branch is already in operation in Clinton. Since § 487.34 reads: "no such branch shall be established in a city or village in which a state or national bank or branch thereof is then in operation" and since, as has been seen, the federal statute is geared to the state law, National, it is argued, is prohibited from establishing a branch.

The only factual information before the Court on the question is found in an amendment to plaintiffs' complaint, filed on June 22, 1959, in which the plaintiffs allege that a branch office of the First National Bank of Mt. Clemens is located at the intersection of Stair Street and Gratiot Avenue which location is outside the corporate limits of the City of Mt. Clemens and within the unincorporated township of Clinton. On oral argument, the defendant could furnish the Court with no contrary information.

If plaintiffs can actually prove the existence of this Mt. Clemens branch bank, a certificate could not conceivably issue to National since if Clinton is a "village or city", § 487.34 prohibits another outside branch, while if Clinton is not a "village or city", National may not

have its branch because § 487.34 permits branches only in a "village or city".[9] On oral argument, counsel for defendant did not disagree with these conclusions.

On oral argument of this motion for a preliminary injunction and in defendant's memorandum of points and authorities in opposition to plaintiffs' motion for a preliminary injunction, defendant raised four arguments all questioning the jurisdiction of this court: (1) the suit is premature; (2) plaintiffs lack standing to sue; (3) National is an indispensable party; (4) there is no justiciable case or controversy.

### Is the suit premature?

■ The answer to this depends upon whether (a) the defendant "threatens" any action impairing plaintiffs' rights; and whether (b) the plaintiffs have an adequate remedy should a certificate issue from defendant.

Defendant argues that the pending application of National has not been acted upon nor has any illegal action been threatened. Plaintiffs counter by saying that once the certificate issues they will be without a remedy.

If it is too late for the plaintiffs to protect their rights once the certificate issues, and if, as the defendant asserts, it is now too early to bring the suit, when can the plaintiffs have their day in court? One possibility is after the defendant approves National's application—if he does —but before defendant issues his certificate.[10] The difficulty with this is the defendant has stated he might issue the certificate as notice of approval of the application—thus doing away with any time delay between approval and certification.[11] On oral argument, the Court

approximate center of the greatest concentration of population in the area." Wyandotte Savings Bank v. Eveland, supra, at page 618 of 78 N.W.2d.

9. Admittedly, if the latter factual proposition is accepted, the validity of the establishment of the Mt. Clemens branch bank is in serious doubt. This, however, would not aid National: one illegally established branch can hardly serve as authorization for another.

10. Approval of an application is not sufficient authority to establish the branch; there must be issuance of the formal certificate itself. National Bank of Detroit v. Wayne Oakland Bank, 6 Cir., 1958, 252 F.2d 537, certiorari denied 1958, 358 U.S. 830, 79 S.Ct. 50, 3 L.Ed.2d 69.

11. Consent of the state commissioner of banking would not be needed to establish a branch of a national bank; this is so even though state law requires that

inquired of counsel whether the defendant would be willing to notify the plaintiffs, in the event approval was given, of his intention to issue a certificate prior to its issuance so that the plaintiffs could seek whatever legal relief was available. Even though there customarily is an interval of from twenty days to six months between the time of approval and the time of certification,[12] the defendant was unwilling to promise one in this case.

Thus, if plaintiffs have no adequate remedy once the certificate issues—and, as discussed below, it does not appear as if they do—relief is now or never.

The Court notes that the regulations under which the Comptroller's office operates, states that when the Comptroller receives an application for a branch bank, the District Chief Examiner is instructed to make an investigation to determine the need, etc., for the branch.[13] At p. 2 of defendant's moving papers it is said:

"The branch application has been processed through the Comptroller's office in the usual way * * *."

Thus all there appears left to do is to decide—and the defendant has indicated that this now can take place at any time.[14] Under these circumstances, the Court is of the opinion that the suit is not premature. Cf. Vicksburg Waterworks Co. v. City of Vicksburg, 1902, 185 U.S. 65, 82, 22 S.Ct. 585, 46 L.Ed. 808.

The cases cited by the defendant to establish his proposition that this case is premature do not do so. Waite v. Macy, 1918, 246 U.S. 606, 38 S.Ct. 395, 62 L.Ed. 892, is cited and this is strange, since the case held that an administrative officer may be enjoined where there is no other adequate remedy and where an intention to obey an illegal regulation is not directly disclaimed. First National Bank of Albuquerque v. Albright, 1908, 208 U.S. 548, 28 S.Ct. 349, 52 L.Ed. 614, concerned the enjoining of an alleged illegal reassessment that had not yet been made. The Court simply held that the plaintiff must wait for relief until such time as the reassessment was actually made. It can be seen that plaintiff there

banks secure written consent of the state commissioner. Rushton ex rel. Commissioner of Banking Department v. Michigan Nat. Bank, 1941, 298 Mich. 417, 299 N.W. 129, 136 A.L.R. 458.

12. The Assistant United States Attorney so indicated on oral argument. And see National Bank of Detroit v. Wayne Oakland Bank, supra, note 10.

13. C.F.R., Title 12, Ch. 1, Part 4, § 4.5 reads:
"Authorizing branches and seasonal agencies—(a) Branch banks. (1) Under the provisions of R.S. 5155, as amended; 12 U.S.C. 36, national banks may, subject to the approval of the Comptroller of the Currency, establish and operate branches and seasonal agencies. Upon receipt of an application form a national bank or any bank operating in the District of Columbia, for a branch or seasonal agency, the appropriate District Chief Examiner is instructed to make an investigation, taking into consideration the financial history and condition of the bank, the adequacy of its capital structure, its future earnings prospects, the general character of its management, the number of branches now in operation and their location, the proposed location of the new branch and the distance from the head office, the nearest banking facilities, the convenience and needs of the communitey [sic] to be served by the new branch, the nature of the potential clientele and possible business available, including an estimate of contemplated volume within a reasonable period of time and the prospects of successful operation of the branch, together with any other pertinent factors.

"(2) The examiner's report is submitted to the District Chief Examiner who forwards it to this office with his own comments and recommendation. The information and data is analyzed, briefed and routed in the same way as an application for a charter.

"(3) If the decision is unfavorable the applicant bank is so notified. If the decision is favorable the Comptroller issues a formal certificate evidencing his approval and consent to the establishment and operation of a branch bank at the designated location."

14. See, supra, 174 F.Supp. at page 773: "a decision on the subject proposal is imminent."

would have a remedy after the reassessment was made: e, g., it could pay the tax under protest and bring suit to recover the amount unlawfully collected.

█ Defendant argues that the approval or disapproval of branches of national banks is a matter clearly committed to the discretion of the Comptroller. But there is no discretion in the Comptroller to approve the establishment of a branch office at a location prohibited by law. Defendants cite Apfel v. Mellon, 1929, 59 App.D.C. 94, 33 F.2d 805, and First National Bank of McKeesport v. Home Loan Bank Board, 1955, 96 U.S. App.D.C. 194, 225 F.2d 33. Apfel was a suit to compel the Federal Reserve Board to approve the articles of incorporation of the appellants so that they might engage in international or foreign banking. The Court held that mandamus would not lie to control the exercise of the Board's discretion. In the instant case, there is no desire to control the defendant's discretion; whether a particular area is in need of a bank, whether the local conditions warrant one, etc. (see supra, note 13) is clearly within the Comptroller's discretion. But, as mentioned above, there is no discretion to unlawfully issue a certificate. In Bank of McKeesport, the Court held that the Federal Home Loan Bank Board may grant permission to a federal savings and loan association to establish a branch bank without an agency hearing. The National Banking Act was not involved there, as it is here, and evidently there is no statute expressly setting forth limitations on the establishment of branch offices of savings and loan associations. See North Arlington National Bank v. Kearny Federal Savings & Loan Ass'n, 3 Cir., 1951, 187 F.2d 564, certiorari denied 342 U.S. 816, 72 S.Ct. 30, 96 L.Ed. 617; United States ex rel. State of Wisconsin v. First Federal Sav. & Loan Ass'n, D.C.E.D.Wis.1957, 151 F.Supp. 690, reversed on jurisdictional grounds 7 Cir., 1957, 248 F.2d 804, certiorari denied 1958, 355 U.S. 957, 78 S.Ct. 543, 2 L.Ed.2d 533.

The other cases, similarly, are distinguishable on their facts.

The crucial issue remains: once the certificate issues, do the plaintiffs have a remedy? Defendant asserts they do; however, when questioned on oral argument, the Assistant United States Attorney was unable to provide the Court with a precise description of the nature of this remedy.

Plaintiffs contend that if the certificate issues, objection can be raised only by the United States; that the certificate is conclusive against all others as to the authority of the national bank's branch to conduct banking. The cases cited by the plaintiffs are of two types: (1) those holding that the facts upon which the Comptroller bases his decision to issue a certificate can not be questioned by anyone except the United States, see 12 U.S. C.A. § 27 and cases cited; and (2) those holding that only the United States may inquire into the validity of an executed contract entered into by a national bank, see, e. g., Kerfoot v. Farmers' & Merchants' Bank, 1910, 218 U.S. 281, 31 S. Ct. 14, 54 L.Ed. 1042.

But can a private party, or the attorney general of a state, bring a quo warranto proceeding—in his own name, or in the name of the United States—to challenge the validity of the establishment of a branch of a national bank?

In the first place, even if quo warranto were available, time might elapse before the plaintiffs could have the matter finally decided, and during this time National might operate its branch to the detriment of the plaintiffs.[15] Secondly, the remedy is speculative at best. The Michigan Supreme Court has held that Michigan courts would not have jurisdiction to hear such a matter since a national bank is a federally created corporation and a suit challenging the right of a national bank to establish and operate a branch bank raises questions of

---

15. It is noted that state courts are forbidden to issue preliminary injunctions against national banks. 12 U.S.C.A. § 91.

federal law. Millard v. National Bank of Detroit, supra, note 7. Cases such as First National Bank of Bay City v. Fellows ex rel. Union Trust Co., 1917, 244 U.S. 416, 37 S.Ct. 734, 61 L.Ed. 1233; First National Bank in St. Louis v. State of Missouri, 1924, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486; Ex parte Worcester County National Bank, 1929, 279 U.S. 347, 49 S.Ct. 368, 73 L.Ed. 733, were distinguished on the ground that what was involved in those cases was state law.[16]

In United States ex rel. State of Wisconsin v. First Federal Savings & Loan Ass'n, 7 Cir., 1957, 248 F.2d 804, certiorari denied 1958, 355 U.S. 957, 78 S.Ct. 543, 2 L.Ed.2d 533, the Court held that a federal district court has no original [17] jurisdiction to entertain a quo warranto action filed by the State of Wisconsin in the name of the United States to test the right of a federal savings and loan association to establish three limited agency offices. Jurisdiction, it had been argued, flowed from 28 U.S.C. § 1345 and § 1651(a). The Court rejected the arguments, saying that § 1345 [18] was inapplicable because the suit, while in the name of the United States, actually was a suit by the State of Wisconsin.[19] And § 1651(a),[20] the Court held, "does not enlarge or expand the jurisdiction of the courts but merely confers ancillary jurisdiction where jurisdiction is otherwise granted and already lodged in the court." 248 F.2d at page 808.

While plaintiffs here might succeed in persuading the United States Attorney General to institute quo warranto proceedings, even though the plaintiff in First Federal could not, the remedy is hardly an "adequate" one; it is speculative at best and in the Court's opinion not sufficient to prevent the issuance of a preliminary injunction. Cf. Columbian Cat Fanciers v. Koehne, 1938, 68 App.D. C. 257, 96 F.2d 529, 532, in which it was held that the remedy of quo warranto is not an "adequate remedy at law", so as to preclude equitable relief, where the party interested must appeal to the discretion of some other person or body to maintain quo warranto.

" 'Adequate remedy at law' means a remedy vested in the complainant, to which he may at all times resort at his own option, fully and freely,

16. The federal statutes in Bay City and Worcester empowered national banks to act as trustees but each had a proviso that the banks could not, in any event, act "in contravention of" state or local law. The Millard Court was of the opinion that this language meant a national bank violated state law when it acted "in contravention" thereof. But 12 U.S.C.A. § 36(c) (involved in Millard but not in Bay City or Worcester) was read as merely setting a standard: one of the prerequisites to the establishment of a branch of a national bank is that a branch of a state bank could, under state law, be established at the location; a violation of § 36(c) constitutes a violation of federal law only and not, as in Bay City and Worcester, a violation of both state and federal law. Whether the Michigan Supreme Court's reasoning is sound is not for this Court to say; what is significant is that a quo warranto proceeding challenging a national bank cannot be brought in a Michigan state court.

17. As opposed to removal jurisdiction; see, Ames v. State of Kansas, 1884, 111 U.S. 449, 4 S.Ct. 437, 28 L.Ed. 482. Plaintiffs here could not look to removal under 28 U.S.C. § 1441 (1952) to get into a federal court since, for one thing, only a defendant may remove, and obviously, plaintiffs could not depend upon National's aid in this respect.

18. "United States as plaintiff
"Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

19. The Court indicated that the United States Attorney General had expressly refused to institute the action. 248 F.2d at page 808.

20. "Writs.
"(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

without let or hindrance." 68 App. D.C. at page 260, 96 F.2d at page 532.[21]

A suit for damages against the Comptroller of the Currency for unlawfully issuing a certificate of authorization is also not an "adequate remedy at law" since, for one thing, such a suit can not be brought. Cooper v. O'Connor, 1938, 69 App.D.C. 100, 99 F.2d 135, 118 A.L.R. 1440, certiorari denied 1938, 305 U.S. 642, 59 S.Ct. 146, 83 L.Ed. 414; Standard Nut Margarine Co. of Florida v. Mellon, 1934, 63 App.D.C. 339, 341, 72 F.2d 557, 559, certiorari denied 1934, 293 U.S. 605, 55 S.Ct. 124, 79 L.Ed. 696.

Do the plaintiffs have standing? Is the case justiciable? Is National an indispensable or necessary party?

The plaintiffs are two state banks within two and a half miles of the proposed location of National's branch; they are seeking to enjoin unlawful competition which threatens them with irreparable and immediate [22] damage. An uncontroverted affidavit states that there is insufficient banking business in Clinton itself; any new branch in Clinton would have to draw its business from the surrounding communities which these plaintiffs already service. Under the circumstances of this case, the Court is of the opinion that plaintiffs have standing to bring this suit.

In National Bank of Detroit v. Wayne Oakland Bank, supra, note 10, a suit was brought by a state bank to enjoin the Comptroller from issuing a certificate authorizing a national bank to establish a branch office in Troy, Michigan.[23] On the question of standing, the Court stated:

"As to the standing of the Wayne Oakland Bank to maintain its suit, it was faced with invasion of property rights, and injury from a competition which was prohibited by the federal statutes subjecting national banks to the same rules of law as cover state banks. The district court found, as a fact, that the competition resulting from the opening and operation of a branch by the National Bank of Detroit would certainly cause inestimable damage to The Wayne Oakland Bank. Whether the rights of a party are infringed by unlawful action of an individual or by exertion of unauthorized federal administrative power, it is entitled to have such controversy adjudicated." 252 F.2d at page 544.

And see Frost v. Corporation Commission, 1929, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483.

An indispensable party may be defined as one whose interest in the controversy before the Court is such that the Court can not render an equi-

21. Cf. United States ex rel. Noel v. Carmody, 1945, 80 U.S.App.D.C. 58, 148 F.2d 684, and United States ex rel. Robinson v. Bar Ass'n of District of Columbia, 1952, 91 U.S.App.D.C. 5, 197 F.2d 408. Note that the only federal statute expressly authorizing original quo warranto proceedings could not apply to a branch of National since such a branch would not be "within the District [of Columbia]". D.C.Code, §§ 16–1601 to 16–1611 (1951), formerly 28 U.S.C. §§ 377a–377c. Indeed, in First Federal, the Court, quoting the Cyclopedia of Federal Procedure, 2d Ed., Sec. 7098, stated: "No instance is known of the use of writ of quo warranto in a district court of the United States other than the District Court of the District of Columbia." Rule 81(a) (2) of the Federal Rules of Civil Procedure 28 U.S.C. makes the Rules applicable to quo warranto proceedings on appeal, and generally where a statute does not set forth the practice, but, of course, Rule 81 can not be taken as a grant of jurisdiction. Federal Rule of Civil Procedure 82.

22. At oral argument, it was indicated that in the past, a branch office was set up by a large bank although the only office facilities were a shack and one desk. In other words, once the certificate issues, National's branch might begin operations forthwith. And see supra, note 11.

23. Jurisdiction was acquired over the Comptroller by his consent. Consent to be sued in Michigan was refused in the instant case.

table judgment without having jurisdiction over him. While it might have been helpful to the Court to have had the additional oral arguments and briefs of National, the Court is of the opinion that an equitable judgment can be rendered in this case without having National before the Court. In Gauss v. Kirk, 1952, 91 U.S.App.D.C. 80, 198 F.2d 83, 33 A.L. R.2d 1085, a potential purchaser of realty brought suit to recover a deposit held by the broker. The potential vendors of the property, upon whom service could not be had, also claimed the deposit. The Court held that the vendors should be deemed conditionally necessary but not indispensable parties. Judge Fahy stated:

"Moore's Federal Practice, Vol. 3, 2154-5 (2nd ed. 1948), indicates that the true rule as to indispensability calls for a reconciliation of the desirability on the one hand of preventing multiplicity of suits and obtaining a complete and final decree between all interested parties, and, on the other hand, of having some adjudication if at all possible rather than none, leaving the parties remediless because of 'an ideal desire to have all interested persons before the court.' This is an interpretation of the applicable principles which in the end guides our decision in this case." 91 U.S.App.D.C. at page 83, 198 F.2d at page 85.

In an analogous situation to the case at hand, Cherokee Nation v. Hitchcock, 1902, 187 U.S. 294, 23 S.Ct. 115, 47 L. Ed. 183, the Supreme Court held that proposed lessees of oil lands were not indispensable parties in a suit against the Secretary of Interior to restrain him from leasing the oil lands held for the benefit of the Cherokee Nation. In the instant case, if the plaintiffs are finally successful, the reason will have to be that National's branch—or any outside branch—may not be located in Clinton. Under these circumstances the Court is of the opinion that National is not an indispensable party to this action.

Furthermore, since jurisdiction can not be acquired over National without their consent or voluntary appearance, and, in addition, since venue is not proper as to them in this district, the Court in its discretion holds that National is not a necessary party. Federal Rule of Civil Procedure 19(b); 12 U.S.C.A. § 94. The Court quotes, with approval, the following statement of Professor Moore:

"The general theory as to who are indispensable and necessary parties applies to suits for declaratory judgments. Obviously, an indispensable party must be joined in a declaratory judgment action, just as in any other, since the court could not proceed to enter an equitable judgment in the absence of such a party. But we have called attention to the desirability of not expanding the concept of indispensable parties to the point that parties, having rights warranting adjudication, are left remediless, if it is at all possible to proceed with the parties before the court, and that 'a court of equity will strain hard to reach that result.' As a result of this, and due to the flexibility of the declaratory judgment procedure there may be times when the court will be able to proceed, without prejudicing the rights of absent persons, when it would be difficult to do so under a more rigid procedure. * * *" 3 Moore's Federal Practice para. 19.17.

Finally, the Court emphasizes that because of the form that the order on this motion will take, there will be no undue interference in the running of the Comptroller's office. The Comptroller is free to approve or disapprove the application of National as he sees fit. As appears below, the preliminary injunction will take effect only when and if approval of the application is granted, and then only until such time as this suit is finally resolved.

This memorandum is to be considered specific findings of fact and conclusions of law. The Court notes that because

782

there was no dispute as to the basic facts, it did not consider it necessary to hear oral testimony. See Ross-Whitney Corp. v. Smith Kline & French Laboratories, 9 Cir., 1953, 207 F.2d 190, 198; 7 Moore's Federal Practice para. 65.04 [3].

The motion for a preliminary injunction is granted but the injunction shall be stayed until such time as approval is given by the defendant or his agents to the Manufacturers National Bank of Detroit, Detroit, Michigan, for the establishment and operation of a branch of said Bank at a location in the unincorporated area of Clinton Township, Macomb County, Michigan.